**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

PARK 80 HOTELS, LLC, a Louisiana    *
limited liability company,               *
individually, and on behalf of a class   *
of similarly situated individuals and   *
entities, et al.,                    *
                                   *
        Plaintiffs,            *
                                   *
     v.                   *       1:21-CV-04650-ELR
                                   *
HOLIDAY HOSPITALITY        *
FRANCHISING, LLC, et al.,      *
                                   *
        Defendants.        *
                                   *

---

**O R D E R**

---

Presently before the Court is Defendants' "Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint." [Doc. 73]. The Court sets forth its reasoning and conclusions below.

## I.    Background[1]

This case arises from a set of disputes between a family of companies that sells hotel franchises and purchasers of those franchises. See generally Consol.

---

[1] For purposes of the present motion only, the Court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

Class Action Compl. ("Consol. Compl.") [Doc. 65]. Plaintiffs Park 80 Hotels, LLC; PL Hotels, LLC; PH Lodging Tomball, LLC; Aaron Hotel Group, LLC; 110 Sunport, LLC; and Synergy Hotels, LLC are all operators of a Holiday Inn Express, Holiday Inn Express & Suites, or Staybridge Suites franchise. See id. ¶¶ 8, 42–47, 59. Defendant Six Continents Hotels, Inc.—"the world's largest hotel company by room count"—"does business under the name InterContinental Hotels Group" ("IHG") and "owns, manages and/or franchises" various hotel brands including Holiday Inn Express, Holiday Inn Express & Suites, and Staybridge Suites. See id. ¶¶ 1–3. Defendant "IHG owns Defendant Holiday Hospitality Franchising, LLC, . . . which offers and sells Holiday Inn brand franchises including, but not limited to, Holiday Inn, Holiday Inn Express, and Holiday Inn Resort." See id. ¶ 5.

When Defendant Holiday Hospitality sells a franchise, it enters into a License Agreement with the franchisee. See id. ¶ 7. Between 2014 and 2019, each of Plaintiffs entered into a License Agreement with Defendant Holiday Hospitality.[2] See id. ¶ 59. Pursuant to the Federal Trade Commission's so-called "Amended

---

[2] Plaintiffs state that all of the relevant License Agreements were attached to the Consolidated Complaint. See Consol. Compl. ¶ 59. However, the Consolidated Complaint contains no attachments. See generally id. Nonetheless, the License Agreement Plaintiff Park 80 Hotels entered into with Defendant Holiday Hospitality is available at Docket Enty 1-2. [See generally Doc. 1-2]. The Parties appear to agree that there are no material differences between the License Agreements various Plaintiffs entered into with Defendant Holiday Hospitality. See generally Consol. Compl.; [see also Doc. 73-1 at 10 n.3]. Thus, the Court herein refers to a single "License Agreement" and cites Plaintiff Park 80 Hotels' License Agreement when referring to that document. [See generally Doc. 1-2].

Franchise Rule," those entities—like Defendants—that sell franchises must make a "pre-sale disclosure of [the] material information necessary to make an informed purchasing decision" about the franchise.   See Disclosure Requirements and Prohibitions Concerning Franchising, 72 Fed. Reg. 15444, 15448 (Mar. 30, 2007). Thus, before Defendant Holiday Hospitality and each Plaintiff entered into the License Agreement, Defendant Holiday Hospitality provided each Plaintiff with a "Franchise Disclosure Document" (the "FDD").  See Consol. Compl. ¶ 139; [Doc. 76-1].

Plaintiffs now allege that Defendants engage in an array of "unlawful, abusive, fraudulent, anticompetitive and unconscionable practices designed solely to benefit and enrich" themselves and their "shareholders . . . at the expense and to the detriment of Plaintiffs" and "similarly situated franchisees." See Consol. Compl. ¶ 11.   Plaintiffs contend this conduct violates the License Agreement, representations Defendants made in the FDD, or some combination of both.  See generally id.  As a result of these purportedly wrongful practices, Plaintiffs filed six

(6) separate but similar putative class actions in federal courts around the country.[3] Each of these actions was subsequently transferred to this Court.  [See, e.g., Doc. 46].   By Orders dated December 29, 2021 and March 23, 2022, the Court consolidated these six (6) actions pursuant to Federal Rule of Civil Procedure 42(a). [See Docs. 60, 64].

In its March 23, 2022 Order, the Court set forth a schedule for the filing of a consolidated complaint "on behalf of all current Plaintiffs" and for Defendants' response thereto.  [See Docs. 63, 64].  On March 31, 2022, Plaintiffs filed their Consolidated Class Action Complaint (the "Consolidated Complaint").  See Consol. Compl.  The Consolidated Complaint asserts seven (7) causes of action on behalf of all Plaintiffs from the five (5) consolidated cases that are currently before the Court.[4] See id. ¶¶ 42–47.  On May 13, 2022, Defendants moved to dismiss the Consolidated Complaint in full.  [See Doc. 73].  Having been fully briefed, that motion is now ripe

---

[3] See Class Action Compl. [Doc. 1] (originally filed in the Eastern District of Louisiana); Class Action Compl., PH Lodging Tomball, LLC v. Holiday Hospitality Franchising, LLC, Civil Action No. 1:21-CV-05072-ELR, ECF No. 1 (originally filed in the Southern District of Texas); Compl. – Class Action, Bensalem Lodging Associates LLC v. Holiday Hospitality Franchising, LLC, Civil Action No. 1:21-CV-05081-ELR, ECF No. 1 (originally filed in the Eastern District of Pennsylvania); Class Action Compl., Synergy Hotels, LLC v. Holiday Hospitality Franchising, LLC, Civil Action No. 1:21-CV-05164-ELR, ECF No. 1 (originally filed in the Southern District of Ohio); Compl., 110 Sunport LLC v. Holiday Hospitality Franchising, LLC, Civil Action No. 1:22-CV-00456-ELR, ECF No. 1 (originally filed in the District of New Mexico); Class Action Compl., Aaron Hotel Group, LLC v. Holiday Hospitality Franchising, LLC et al., Civil Action No. 1:22-CV-00838-ELR, ECF No. 1 (originally filed in the District of Connecticut).

[4] On January 4, 2022, the plaintiff in Bensalem Lodging Associates voluntarily dismissed its claims with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  See Notice of Dismissal with Prejudice, Bensalem Lodging Assocs., Civil Action No. 1:21-CV-05081-ELR, ECF No. 39.

for the Court's review.  [See Docs. 73-1, 76, 79].  The Court begins by setting forth the pertinent legal standard.

## II.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Put differently, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See id.  This so-called "plausibility standard" is not akin to a probability requirement; rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim.  See id.

When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff.  See Twombly, 550 U.S. at 555–56; United States v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam).  Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.  See Ashcroft, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555); accord Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007).  Rather, "a pleading must contain a short and plain

statement of the claim showing that the pleader is entitled to relief" so as to satisfy "the pleading requirements of Rule 8." See Parker v. Brush Wellman, Inc., 377 F. Supp. 2d 1290, 1294 (N.D. Ga. 2005) (citing FED. R. CIV. P. 8(a)(2)).

## III.   Discussion

Defendants argue that the entire Consolidated Complaint should be dismissed as a shotgun pleading and that each of the seven (7) causes of action Plaintiffs assert in it should be dismissed for claim-specific reasons.  [See generally Doc. 73-1]. Below, the Court first discusses Defendants' shotgun pleading argument before considering the Parties' arguments that are specific to each cause of action.

### A.   Defendants' Shotgun Pleading Argument

Defendants first argue that "the [Consolidated] Complaint should be dismissed because it is nothing more than a shotgun pleading that fails to provide any 'short' or 'plain' statement of the purported claims, as required under Rule 8." [Doc. 73-1 at 11].[5]  They claim that the Consolidated Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" such that "it is impossible to determine how the more-than 200 paragraphs preceding [Plaintiffs'] seven 'Counts' correlate to their Counts, including without limitation which allegations are intended to support which claims."  [See

---

[5] All pinpoint citations to record materials herein are to the blue page numbers generated by the Court's CM/ECF system.

id.] (quoting AlertPoint, LLC v. Olds, Civil Action No. 1:18-CV-3879-ELR, 2021 WL 1778033, at *7 (N.D. Ga. Mar. 30, 2021)).  Plaintiffs respond that "[e]ach count specifies the allegations outlined in the preceding paragraphs that are intended to support it, leaving no doubt as to which factual allegations give rise to which claims for relief."  [Doc. 76 at 6].

Upon review, the Court agrees with Plaintiffs that the Consolidated Complaint is not a shotgun pleading.  As the Eleventh Circuit has observed, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1323 (11th Cir. 2015).  Here, with some limited exceptions described below, the Consolidated Complaint "give[s] . . . [D]efendants adequate notice of the claims against them and the grounds upon which each claim rests."  See id.  Plaintiffs clearly identify what causes of action they assert against which Defendants.  See Consol. Compl. ¶¶ 214–70.  And they describe the factual underpinning of each substantive cause of action (Counts I–IV) within the section of the Consolidated Complaint corresponding to each of those causes of action.  See id. ¶¶ 214–58.  For example, Plaintiffs' breach of contract claim identifies twelve (12) alleged breaches of the relevant contract and eight (8) alleged associated breaches of the duty of good faith and fair dealing.  See id. ¶¶ 214–20.

Though certain of Plaintiffs' factual allegations, such as those concerning Defendants' purported racial discrimination against Indian-American and South Asian-American franchisees, appear to be immaterial to their asserted causes of action, that fact alone is an insufficient basis on which the Court could conclude that the Consolidated Complaint fails to pass Rule 8 muster.  See Barmapov v. Amuial, 986 F.3d 1321, 1325 (11th Cir. 2021) (concluding that a complaint was a shotgun pleading because it was "*rife with* immaterial factual allegations" (emphasis added)); Weiland, 792 F.3d at 1322 (describing only those complaints that are "*replete with* conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" as shotgun pleadings (emphasis added)).  Accordingly, the Court rejects Defendants' request to dismiss the Consolidated Complaint as a shotgun pleading and turns to the Parties' Count-specific arguments.

### B.   Count I: Breach of Contract

In Count I, for breach of contract, Plaintiffs allege that Defendant Holiday Hospitality breached twelve (12) "express and implied duties under the License Agreement" and that all Defendants "routinely violate the duty of good faith and fair dealing" in eight (8) ways.  See Consol. Compl. ¶¶ 214–220.  Defendants argue that all of Plaintiffs' asserted breaches of contract fail because (1) the License Agreement "expressly authorized [Defendants] to undertake . . . the activit[y] [Plaintiffs] complain of," (2) Georgia's voluntary payment doctrine bars recovery based on the

purportedly breaching conduct, (3) the purported breaches are based on a "pre-contractual representation[ that] cannot support a breach of contract claim as a matter of law," or (4) some combination of these three (3) things.  [See Docs. 73-1 at 18–24; 79 at 7–18].  Below, the Court begins by setting forth relevant principles of the Georgia law of contracts.

1.  Relevant principles of the Georgia law of contracts

To survive a motion to dismiss challenging the sufficiency of a breach of contract claim brought pursuant to Georgia law, a plaintiff must allege: "(1) breach and (2) resultant damages (3) to a party who has the right to complain about the contract being broken."[6]  See Kuritzky v. Emory Univ., 669 S.E.2d 179, 181 (Ga. Ct. App. 2008).  To allege the "breach" element of such a claim, a plaintiff must point to a specific contractual provision that the defendant breached through its alleged conduct.  See Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C., 426 F. Supp. 2d 1356, 1369 (N.D. Ga. 2006) (citing Adkins v. Cagle Foods JV, LLC, 411

---

[6] Georgia law applies to Plaintiffs' state law claims pursuant to a choice of law clause in the License Agreement.  [See Doc. 1-2 at 25] ("This License, all relations between the parties, and any and all disputes between the parties, whether sounding in contract, tort or otherwise, shall be governed and construed under, and in accordance with, the laws and decisions (except any conflicts of law provisions) of the State of Georgia."); see also Branch Banking & Tr. Co. v. Lichty Bros. Constr., 488 F. App'x 430, 433 (11th Cir. 2012) ("When it exercises jurisdiction based on diversity of citizenship, a federal court must apply the choice of law rules of the forum state to determine which substantive law governs the action.  Georgia generally enforces contractual choice of law provisions unless they are contrary to public policy." (internal citations omitted)).

F.3d 1320, 1327 (11th Cir. 2005)); [see also Doc. 76 at 15–16] (Plaintiffs admitting this point).

Georgia law provides that "[e]very contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement." McGee v. Patterson, 746 S.E.2d 719, 727 (Ga. Ct. App. 2013) (quoting Myung Sung Presbyterian Church v. N. Am. Ass'n of Slavic Churches & Ministries, 662 S.E.2d 745, 748 (Ga. Ct. App. 2008)). This implied covenant, however, does not create an independent basis for liability and cannot be breached apart from the specific provisions of the underlying contract. Id. Instead, the covenant "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms de facto when performance is maintained de jure." Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990).

> Thus, in order to state a claim for breach of the implied duty of good faith and fair dealing, a plaintiff must set forth facts showing a breach of an actual term of an agreement. General allegations of breach of the implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable.

Am. Casual Dining, 426 F. Supp. 2d at 1370; Ameris Bank v. Alliance Inv. & Mgmt. Co., LLC, 739 S.E.2d 481, 486 (Ga. Ct. App. 2013) ("[T]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do."); Martin v. Hamilton State Bank, 723 S.E.2d 726, 728 (Ga. Ct. App. 2012) ("Firms that have negotiated

contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' . . . 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.  When the contract is silent, principles of good faith fill the gap.  They do not block use of terms that actually appear in the contract."  (internal alteration adopted) (quoting Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990))).

"[W]here the manner of performance" of a certain duty pursuant to a contract "is left more or less to the discretion of one of the parties to the contract," that party is generally "bound to the exercise of good faith" in its performance of the relevant duty.  See ULQ, LLC v. Meder, 666 S.E.2d 713, 717 (Ga. Ct. App. 2008).  However, an "exception[] to this rule" exists "where an agreement by its express terms grants the party absolute or uncontrolled discretion in making a decision."  See id.  In that situation, a contracting party may exercise the "unfettered control and discretion" the contract provides it and "need not . . . exercise[]" that discretion "in good faith."

See Charles v. Leavitt, 442 S.E.2d 241, 242 (Ga. 1994); see also ULQ, 666 S.E.2d at 717.[7]

Finally, "Georgia law is clear that construction of a contract is a matter of law for the court." Mehic v. Allstate Prop. & Cas. Ins. Co., 587 F. Supp. 3d 1327, 1331 (N.D. Ga. 2022) (cleaned up) (quoting Envision Printing, LLC v. Evans, 786 S.E.2d 250, 252 (Ga. Ct. App. 2016)). The first step in contract construction is to "decide whether the" pertinent contractual "language is clear and unambiguous." Id. (quoting Envision Printing, 786 S.E.2d at 252). "If it is, no construction is required" and the analysis ends there; "the court simply enforces the contract according to its clear terms." Id. (quoting Envision Printing, 786 S.E.2d at 252). In deciding whether the relevant contract language is clear and unambiguous, "court[s] initially look[] to the four corners of the agreement to ascertain the meaning of the contract from the language employed" and, in so doing, give words "their usual and common" meaning. See id. (cleaned up) (quoting Brogdon v. Pro Futures Bridge Cap. Fund, L.P., 580 S.E.2d 303, 306 (Ga. Ct. App. 2003) and O.C.G.A. § 13-2-2(2)).

---

[7] Plaintiffs cite Ernie Haire Ford, Inc. v. Ford Motor Co. in support of their argument that "Defendants' discretion" in performing pursuant to the License Agreement is always "limited to what is reasonable under the law." [See Doc. 76 at 19] (citing 260 F.3d 1285 (11th Cir. Aug 8, 2001)). However, the panel in Ernie Haire Ford was applying Florida law, which is of no relevance to Plaintiffs' claims. See 260 F.3d at 1290–91 ("This case requires us to examine issues concerning the substantive law of Florida."); see also supra p. 9 n.6 (explaining why Georgia law applies to Plaintiffs' state law claims).

2.    <u>Alleged breaches purportedly authorized by the License Agreement</u>

Defendants first argue that seven (7) of the alleged breaches of contract—those asserted in paragraphs 218(a)–(d), (h)–(i), and (k) of the Consolidated Complaint— fail as a matter of law because the conduct alleged therein is permitted pursuant to various portions of the License Agreement." [See Docs. 73-1 at 18–22; 79 at 2–4]. "Plaintiffs do not contest that the [License] Agreement gives [Defendants] broad discretion" to perform the contract between the Parties, "but . . . assert that Defendants' discretion is limited to what is reasonable under the law" and contend that "Defendants have capriciously exercised the discretion they are afforded by the Agreement in a way that defeats the reasonable expectations of Plaintiffs" and thus breaches the contract between the Parties. [See Doc. 76 at 18–19, 23–24]. In this regard, Plaintiffs argue that "Georgia law is clear that Defendants do not have the right to act in an arbitrary, bad-faith and abusive manner towards" them. [See id. at 12–13]. Below, the Court explains why each of the breach of contract theories Plaintiffs advance in paragraphs 218(a)–(d), (h)–(i), and (k) of the Consolidated Complaint are foreclosed as matter of law by the License Agreement's plain terms.

> ### a.     Paragraph 218(a)

In paragraph 218(a), Plaintiffs allege that Defendants

> breached [their] express and implied duties under the License
> Agreement by . . . [w]ithout any limitation or stated parameters, . . .
> generally and arbitrarily alter[ing], modify[ing], or revis[ing] [their]
> "Standards" or "System", in [their] sole judgment, as a bad faith means
> to impose undisclosed costs and obligations on franchisees without any
> [f]ranchisee input, agreement, or recourse[.][8]

Consol. Compl. ¶ 218(a).  Defendants contend that their conduct in this regard is

authorized by Sections 1(B) and 3(A)(10) of the License Agreement.  [See Doc. 73-

1 at 20].  Section 1(B) provides:

> The System is composed of all elements which are designed to identify
> Holiday Inn, Holiday Inn Express and Holiday Inn Resort branded
> hotels to the consuming public or are designed to be associated with
> those hotels or to contribute to such identification or association and all
> elements which identify or reflect the quality standards and business
> practices of such hotels, all as specified in this License or as designated
> from time to time by Licensor.  The System at present includes, but is
> not limited to, [certain] service marks . . . and [other] intellectual
> property rights made available to licensees of the System by reason of
> a license; all rights to domain names and other identifications or
> elements used in electronic commerce as may be designated from time
> to time by [Defendants] in accordance with [Defendants']
> specifications to be part of the System; access to a reservation service

---

[8] As noted above, Plaintiffs allege that only Defendant Holiday Hospitality breached the License
Agreement itself but that both Defendants "violate[d] the duty of good faith and fair dealing."
Consol. Compl. ¶¶ 218–19.  Plaintiffs also allege that Defendant "IHG is an intended third-party
beneficiary of the License Agreement[]."  Id. ¶ 55.  Reading these allegations together, the Court
construes the Consolidated Complaint as alleging that both Defendants breached the License
Agreement.  See Hill, 321 F.3d at 1335 (noting that, at the pleadings stage, a court has a duty to
construe the complaint in the light most favorable to the plaintiffs); McGee, 746 S.E.2d at 727
(holding that the duty of good faith and fair dealing does not create a basis for liability independent
of the underlying contract); Hubbard v. Dep't of Transp., 568 S.E.2d 559, 568 (Ga. Ct. App. 2002)
(explaining that an intended third party beneficiary of a contract may sue to enforce that contract).

operated in accordance with specifications established by [Defendants] from time to time; distribution of advertising, publicity and other marketing programs and materials; architectural drawings and architectural [sic] works; the furnishing of training programs and materials; confidential or proprietary information standards, specifications and policies for construction, furnishing, operation, appearance and service of the Hotel, and other requirements . . . as stated or referred to in this License and from time to time in [Defendants'] brand standards for System hotels (the "Standards") or in other communications to [Plaintiffs and other franchisees]. *[Defendants] may add elements to the System or modify, alter or delete elements of the System in [their] sole judgment from time to time.*

[Doc. 1-2 at 5–6] (emphasis added). Section 3(A)(10) provides: "Throughout the entire License Term, [Plaintiffs and other franchisees] will at [their] sole cost and expense . . . adopt all improvements or changes to the System as may be from time to time designated by [Defendants.]" [Id. at 7]. The "License Term" is "(20) twenty years from the date of opening of the Hotel under the System." [See id. at 21].

Upon review, the Court finds that Sections 1(B) and 3(A)(10) of the License Agreement preclude the breach of contract theory in paragraph 218(a) of the Consolidated Complaint as a matter of law. Pursuant to the License Agreement, Defendants had the right to "add elements to the System or modify, alter or delete elements of the System"—which includes the "Standards"—"in [their] sole judgment[.]" [Id. at 5–6]. And Plaintiffs agreed to "adopt all improvements or changes to the System" and the Standards "at [their] sole cost and expense." [Id. at 7]. After agreeing to these terms, Plaintiffs cannot now base a breach of contract claim on Defendants' exercise of their "sole judgment" to make changes to the

System and Standards by claiming that those changes were made in "bad faith."  See Consol. Compl. ¶ 218(a); Charles, 442 S.E.2d at 242; Automatic Sprinkler Corp. of Am. v. Anderson, 257 S.E.2d 283, 284–85 (Ga. 1979) ("The exercise of an absolute right or privilege . . . can be exercised without incurring liability regardless of the motive for so doing." (quoting Schaeffer v. King, 155 S.E.2d 815, 816 (Ga. 1967)); ULQ, 666 S.E.2d at 717.  Thus, to the extent Plaintiffs' breach of contract claim is based on the theory described in paragraph 218(a) of the Consolidated Complaint, it is due to be dismissed.

### b.   Paragraphs 218(b) and (c)

In paragraph 218(b), Plaintiffs allege that Defendants

> breached [their] express and implied duties under the License Agreement by . . . [u]sing [their Property Improvement Plan ("PIP")] program as a means to apply unfettered and open-ended discretion [to] extract otherwise undisclosed fees and fees not contracted for from franchisees, by mandating exorbitant construction and renovation mandates and costs upon franchisees[.]

See Consol. Compl. ¶ 218(b); see also id. ¶¶ 13–14, 88–108.  In paragraph 218(c), Plaintiffs allege that Defendants

> breached [their] express and implied duties under the License Agreement by . . . [, a]s part of the PIP program, forcing franchisees to pay non-refundable fees for mandatory Hotel inspections and preparation of PIP report(s), without any [f]ranchisee consent or agreement, and charging additional undisclosed fees for re-inspections and re-evaluations solely as [Defendants] deem[] necessary and mandate[], and to arbitrarily require such re-inspections and also impose fines solely as a means of enriching [Defendants.]

See Consol. Compl. ¶ 218(c); see also id. ¶¶ 13–14, 88–108.  Elsewhere in the Consolidated Complaint, Plaintiffs explain that the PIP program is a set of inspections Defendants use to ensure that franchisees comply with the Standards "for the upgrading, construction and furnishing of" franchised hotels.  See id. ¶¶ 13–14, 91–96.

Defendants argue that their conduct with regard to the PIP program is authorized by Sections 1(B), 3(A)(12), and 14(L)(2)–(3) of the License Agreement. [See Doc. 73-1 at 21].  Section 1(B) is set forth above.  Section 3(A)(12) provides: "Throughout the entire License Term, [Plaintiffs and other franchisees] will at [their] sole cost and expense . . . permit inspection of the Hotel by [Defendants'] representatives at any time and give them free lodging for such time as may be reasonably necessary to complete their inspections."  [Doc. 1-2 at 7].  Section 14(L)(3) provides that each of Defendants' franchisees "must fund all ordinary and extraordinary maintenance and repair, capital improvements and renovations of the Hotel."  [See id. at 28].

Upon review, the Court finds that Sections 1(B), 3(A)(12), and 14(L)(3) of the License Agreement preclude the breach of contract theories in paragraphs 218(b)

and (c) of the Consolidated Complaint.[9]   As noted, Section 1(B) grants Defendants the right to, "in [their] sole judgment from time to time," "add[,] . . . modify, alter or delete" "specifications and policies for construction, furnishing, operation, appearance and service of the Hotel" as well as "programs for inspecting the Hotel[.]"   [See id. at 5–6.   Plaintiffs allege that the PIP program is a "program[] for inspecting the[ir] [h]otels[].   [See id.]; see also Consol. Compl. ¶¶ 92–97.   Thus, by assenting to the License Agreement, Plaintiffs agreed that Defendants could unilaterally impose conditions like those associated with the PIP program upon them.   [See id. at 5–6.   Plaintiffs further agreed in Sections 3(A)(12) and 14(L)(2) that they would "fund all" construction at "and renovations of the[ir] [h]otel[s]" and that they would permit inspections of their properties "at any time" "at [their] sole cost and expense."   [See id. at 7, 28].   In short, pursuant to the binding terms of the License Agreement, Defendants can fashion programs like PIP and direct compliance with them in their "sole judgment."   Additionally, Plaintiffs agreed to submit to inspections at any time and pay for the costs of those inspections, as well as any construction and renovation costs that they might incur pursuant to programs like the PIP.   Thus, as a matter of law, Plaintiffs cannot base a breach of contract

---

[9] The Court finds that Section 14(L)(2) is not directly relevant to the breaches of contract Plaintiffs allege in paragraphs 218(b) and (c) of the Consolidated Complaint.   Those theories appear to largely concern capital construction type expenses, whereas Section 14(L)(2) appears to primarily concern the replacement of products used to furnish and decorate Plaintiffs' hotels.   Compare Consol. Compl. ¶ 218(b)–(c), [with Doc. 1-2 at 21, 28].

claim on Defendants' enforcement of the PIP program against them for what they view as bad faith reasons or purposes.  [See id. at 5–6, 28]; Consol. Compl. ¶ 218(b)–(c); Charles, 442 S.E.2d at 242; Automatic Sprinkler Corp. of Am., 257 S.E.2d at 284–85; ULQ, 666 S.E.2d at 717.  Therefore, to the extent Plaintiffs' breach of contract claim is based on the theories described in paragraphs 218(b) and (c) of the Consolidated Complaint, it is due to be dismissed.

### c.    Paragraph 218(d)

In paragraph 218(d), Plaintiffs allege that Defendants "breached [their] express and implied duties under the License Agreement by . . . [f]orcing franchisees to utilize only [Defendants'] Approved Suppliers for the goods and services necessary to run the Hotel(s) because such vendors and suppliers provide [Defendants] with rebates and kickbacks[.]"  See Consol. Compl. ¶ 218(d); see also id. ¶¶ 61–87.  Defendants contend that their conduct in this regard is authorized by Sections 1(B), 3(A)(6)–(8), and 4(D) of the License Agreement.  [See Doc. 73-1 at 21].  Section 1(B) is set forth above.  Sections 3(A)(6)–(8) provide:

> Throughout the entire License Term, [a given franchisee] will at its sole cost and expense:
>
> (6)    strictly comply with all of [Defendants'] standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the System and the Hotel from unreliable sources of supply;
>
> (7)    strictly comply with [Defendants'] requirements as to:

(a)     the types of services and products that may be used, promoted or offered at the Hotel;

(b)     the types and quality of services and products that, to supplement services listed on Attachment A, must be used, promoted or offered at the Hotel;

(c)     the use, display, style and type of signage and of all other forms of identification at or pertaining to the Hotel, including but not limited to any use of the Holiday Inn name or any other of [Defendants'] service marks, trademarks or copyrights (in all formats, including but not limited to print, electronic or other media), which are seen by members of the consuming public or used to identify the Hotel to actual or prospective consumers;

(d)     directory and reservation service listings of the Hotel;

(e)     training of persons to be involved in the operation of the Hotel;

(f)     participation in all marketing, reservation service, advertising, training and operating programs designated by [Defendants] as System-wide (or areawide) programs in the best interests of hotels using the System including, without limitation, all guest frequency or loyalty programs related to the System; provided that with regard to area-wide programs, [a given franchisee] may request [Defendants'] approval that [the franchisee] need not participate, reasonable approval not to be withheld;

(g)     maintenance, repair, appearance and condition of, and customer service at, the Hotel, including, without limitation, participation in all guest

complaint programs and quality assurance programs established and maintained by [Defendants], as such programs may be modified by [Defendants] from time to time;

(h)    quality and types of services offered to customers at the Hotel; and

(i)    maintenance of a capital reserve and adherence to capital reinvestment and renovation cycles (as further specified in paragraph 14.L hereof and as [Defendants] may supplement from time to time by the Standards).

(8)    use such automated guest service and/or hotel management and/or telephone or telecommunication system(s) which [Defendants] deem[] to be in the best interests of the System, including any additions, enhancements, supplements, or variants thereof which may be developed during the term hereof[.]

[Doc. 1-2 at 6–7].

Upon review, the Court finds that Sections 1(B) and 3(A)(6)–(8) of the License Agreement preclude the breach of contract theory articulated in paragraph 218(d) of the Consolidated Complaint as a matter of law.[10]  In assenting to the License Agreement, Plaintiffs agreed that Defendants could, "in [their] sole judgment from time to time," "add[,] . . . modify, alter or delete" "specifications and policies for construction, furnishing, operation, appearance and service of the

---

[10] Because the Court finds that Sections 1(B) and 3(A)(6)–(8) of the License Agreement authorize the conduct Plaintiffs complain of in paragraph 218(d) of the Consolidated Complaint, the Court does not consider the meaning or effect of Section 4(D).

Hotel." [See id. at 5–6]. Plaintiffs further agreed to "strictly comply with all of [Defendants'] standards and specifications for goods and services used in the operation of the Hotel" and to "strictly comply with [Defendants'] requirements as to . . . the types of services and products that may be used, promoted or offered at the Hotel[.]" [See id. at 6–7]. Thus, pursuant to the terms of the License Agreement, Defendants have "unfettered control and discretion" to require Plaintiffs and other franchisees to use certain goods and services in operating their hotels, and Georgia law imposes no requirement on Defendants to "exercise[]" that discretion "in good faith." See Charles, 442 S.E.2d at 242; see also ULQ, 666 S.E.2d at 717. And because Defendants are not required to use good faith in selecting which goods or services Plaintiffs and other franchisees must use, their "motive for" such selections cannot create a breach of contract where one does not otherwise exist. See Automatic Sprinkler Corp. of Am., 257 S.E.2d at 285 (quoting Schaeffer, 155 S.E.2d at 816). Thus, to the extent Plaintiffs' breach of contract claim is based on the theory described in paragraph 218(d) of the Consolidated Complaint, it is due to be dismissed.

### d.      Paragraph 218(h)

In paragraph 218(h), Plaintiffs allege that Defendants "breached [their] express and implied duties under the License Agreement by . . . introduc[ing] additional undisclosed marketing (and other) programs and fees as a means to

generate additional revenue for [themselves] to the detriment of franchisees, and without any prior disclosure to or agreement of . . . franchisees[,]" "[d]espite the fact that franchisees pay initial and annual fees associated with marketing[.]"  <u>See</u> Consol. Compl. ¶ 218(h); <u>see also</u> <u>id.</u> ¶¶ 109–28.  Defendants contend that their conduct in this regard is authorized by Sections 3(A)(7)(f) and 3(A)(10) of the License Agreement.  [<u>See</u> Doc. 73-1 at 21].  Section 3(A)(7)(f) is set forth above. Section 3(A)(10) provides: "Throughout the entire License Term, [Plaintiffs and other franchisees] will at [their] sole cost and expense . . . adopt all improvements or changes to the System as may be from time to time designated by [Defendants.]" [Doc. 1-2 at 7].

Upon review, the Court finds that Sections 1(B), 3(A)(7)(f), and 3(A)(10) of the License Agreement preclude the breach of contract theory in paragraph 218(h) of the Consolidated Complaint as a matter of law.  In assenting to the License Agreement, Plaintiffs agreed that Defendants may, "in [their] sole judgment from time to time," "add[,] . . . modify, alter or delete" efforts regarding the "distribution of advertising, publicity and other marketing programs and materials" to the System of which Plaintiffs are a part.  [<u>See</u> <u>id.</u> at 5–6].  Plaintiffs further agreed that they, "[t]hroughout the entire License Term . . . [and] at [their] sole cost and expense[,]" would "participat[e] in all marketing, reservation service, advertising, training and operating programs designated by [Defendants] as System-wide (or areawide)

programs in the best interests of hotels using the System[,]" including any "improvements or changes" made thereto by Defendants.  [See id. at 6–7].

Thus, the License Agreement allows Defendants to change the structure of the marketing programs that are part of the System in their "sole judgment," and, through that Agreement, Plaintiffs agreed to pay for those marketing programs "at [their] sole cost and expense[.]"  [See id.]  Therefore, as a matter of law, Plaintiffs cannot base a breach of contract claim on Defendants' "introduc[ion of] additional . . . marketing (and other) programs and fees."  [See id.]; Consol. Compl. ¶ 218(h); Charles, 442 S.E.2d at 242; Automatic Sprinkler Corp. of Am., 257 S.E.2d at 284–85; ULQ, 666 S.E.2d at 717.  Accordingly, to the extent Plaintiffs' breach of contract claim is based on the theory described in paragraph 218(h) of the Consolidated Complaint, it is due to be dismissed.[11]

### e.    *Paragraph 218(i)*

In paragraph 218(i), Plaintiffs allege that Defendants "ceased and suspended all of [their] marketing efforts and activities during the time of the Covid pandemic, yet continue[] to charge franchisees for the[se marketing] services [that they are] not providing."  See Consol. Compl. ¶ 218(i); see also id. ¶¶ 169–74.  The "charge"

---

[11] Defendants' argument regarding the voluntary payment doctrine concerns the purported breaches of contract in paragraphs 218(a)–c) and (h) of the Consolidated Complaint.  [See Doc. 73-1 at 22–23].  Because the Court finds each of these purported breaches involves conduct authorized by the License Agreement, the Court does not reach Defendants' argument regarding the voluntary payment doctrine.

Plaintiffs refer to in this allegation is a monthly payment—known as a "Services Contribution"—that Plaintiffs make to Defendants of three percent (3%) of the revenue Plaintiffs derive from room rentals and associated food and beverage services. See id. ¶¶ 170–72; [see also Doc. 1-2 at 8, 29].  Section 3(B)(1)(b) of the License Agreement provides that this "Services Contribution" is "to be used by [Defendants] for marketing, reservations, and other related activities which, in [Defendants'] sole business judgment as to the long-term interests of the System, support marketing, reservations and other related functions."  [See Doc. 1-2 at 8]. Defendants contend that their conduct described in paragraph 218(i) of the Consolidated Complaint is authorized by Section 4(G) of the License Agreement. [See Doc. 73-1 at 21].

Upon review, the Court finds that Section 3(B)(1)(b) of the License Agreement precludes the breach of contract theory in paragraph 218(i) of the Consolidated Complaint as a matter of law.[12]  Pursuant to that provision, Defendants can choose to use the Services Contribution funds for marketing or for "reservations" or "other related activities," and the License Agreement gives Defendants the discretion to decide in their "sole business judgment" which of these options would best serve "the long-term interests of the System."  [See id. at 8].  Plaintiffs do not

---

[12] Though Section 4(G) of the License Agreement concerns the Services Contribution Plaintiffs pay to Defendants, the Court finds that this provision does not directly speak to whether the breach of contract theory Plaintiffs articulate in paragraph 218(i) is colorable.  [See Doc. 1-2 at 8, 10, 29]. The Court therefore does not further consider the meaning and effect of Section 4(G) herein.

allege that Defendants retained the entirety of the Services Contributions funds for themselves or spent those funds on something other than "reservations" or "other related activities"; thus, Plaintiffs fail to allege that Defendants' use of the Service Contribution funds was a breach of the License Agreement. See generally Consol. Compl. Therefore, the breach of contract theory Plaintiffs advance in paragraph 218(i) of the Consolidated Complaint fails as a matter of law. See id. ¶ 218(i); see also Am. Casual Dining, 426 F. Supp. 2d at 1369; Kuritzky, 669 S.E.2d at 181.

### f.    Paragraph 218(k)

In paragraph 218(k), Plaintiffs allege that Defendants used their "customer rewards program as a means to allow customers to redeem points earned at point-of-origin franchisee hotels for free hotel stays, depriving the franchisees of this direct revenue, but then reimbursing franchisees only a small percentage of the redeemed points (usually less than 30%) and retaining the remainder for" themselves. See Consol. Compl. ¶ 218(k); see also id. ¶¶ 129–41. Defendants contend that their conduct in this regard is authorized by Sections 3(A)(7)(f) and 3(A)(10) of the License Agreement. [See Doc. 73-1 at 21]. Both of these provisions are set forth above.

Upon review, the Court finds that Sections 1(B), 3(A)(7)(f), and 3(A)(10) of the License Agreement preclude the breach of contract theory in paragraph 218(k) of the Consolidated Complaint as matter of law. In assenting to the License

Agreement, Plaintiffs agreed that Defendants could, "in [their] sole judgment from time to time," "add[,] . . . modify, alter or delete" "elements which are . . . designed to be associated with" "Holiday Inn, Holiday Inn Express and Holiday Inn Resort branded hotels[,]" including "marketing programs."  [See id. at 5–6].  Plaintiffs further agreed to

> [t]hroughout the entire License Term . . . [and] at [their] sole cost and expense[,] participat[e] in all marketing, reservation service, advertising, training and operating programs designated by Licensor as System-wide (or areawide) programs in the best interests of hotels using the System including, without limitation, all guest frequency or loyalty programs related to the System[.]

[Doc. 1-2 at 6–7].  Thus, pursuant to the terms of the License Agreement, Defendants have "unfettered control and discretion" to shape the contours of their customer rewards program, and Georgia law imposes no requirement on Defendants to "exercise[]" that discretion "in good faith."  [See id. at 5–6]; see also Charles, 442 S.E.2d at 242; ULQ, 666 S.E.2d at 717.  Plaintiffs, in turn, are required to "participat[e]" in that rewards program "at [their] sole cost and expense[.]"  [See Doc. 1-2 at 6–7].  Because the License Agreement requires Plaintiffs to participate in the customer rewards program on the terms Defendants alone set for that program, as a matter of law, Plaintiffs cannot base a breach of contract claim on the payments they receive pursuant to that program's terms.  [See id. at 5–7]; Consol. Compl. ¶ 218(k); Charles, 442 S.E.2d at 242; Automatic Sprinkler Corp. of Am., 257 S.E.2d at 284–85; ULQ, 666 S.E.2d at 717.  Thus, to the extent Plaintiffs' breach of contract

claim is based on the theory described in paragraph 218(k) of the Consolidated Complaint, it is due to be dismissed.

### 3.   Breaches purportedly based on pre-contractual representations

Defendants assert that the remaining five (5) breach of contract theories Plaintiffs allege (those in paragraphs 218(e)–(g), (j), and (l)) fail as a matter of law because they are based on representations Defendants allegedly made before the Parties entered into the License Agreements and therefore cannot be contractually binding pursuant to the License Agreement's "Entire Agreement" provision.  [See Doc. 73-1 at 23–24].  Plaintiffs do not appear to address this argument in their response brief.[13]  [See generally Doc. 76].  Upon review, the Court finds that the purported breaches of contract described in paragraphs 218(e)–(g) and (j) of the Consolidated Complaint fail as a matter of law because none are based on a promise Defendants made in the License Agreement.  By contrast, the Court finds that the purported breach of contract described in paragraph 218(l) of the Consolidated Complaint is based on a promise Defendants made in the License Agreement and that Plaintiffs sufficiently allege this breach of contract such that it survives Defendants' present motion to dismiss.

---

[13] Plaintiffs do argue that they have "properly pled a plausible breach of contract claim with respect to the breaches of Item 8 of the FDD."  [See Doc. 76 at 7–11, 15–22].  The Court separately addresses this argument below.  See infra part III.B.4.

First, each of the purported breaches of contract described in paragraphs 218(e)–(g) and (j) are based either on representations Defendants allegedly made to Plaintiffs when Plaintiffs were deciding whether to become Defendants' franchisees or representations Defendants failed to make during that process. The Parties have agreed that the License Agreement is "the entire agreement between the[m] . . . pertaining to the licensing of the Hotel and supersedes all previous negotiations and agreements between the[m] . . . pertaining to the licensing of the Hotel as a Holiday Inn brand group hotel or Holiday Inn Express brand group hotel." [Doc. 1-2 at 26]. Thus, the License Agreement (and any documents that it incorporates by reference) is the sole source of the enforceable promises between the Parties. See First Data POS, Inc. v. Willis, 546 S.E.2d 781, 784 (Ga. 2001) ("In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract 'cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties[.]'" (quoting Campbell v. C & S Nat'l Bank, 415 S.E.2d 193, 195 (Ga. 1992))). Plaintiffs do not identify, nor does the Court locate, any provision in the License Agreement requiring Defendants to disclose all fees for which Plaintiffs would be responsible or all business relationships Defendants might form that could cause a conflict of interest with Plaintiffs; thus, Plaintiffs cannot, as a matter of law, base their breach of contract on the omissions described in paragraphs 218(g) and (j) of the Consolidated Complaint.

See generally Consol. Compl.; [Docs. 1-2 at 26; 76]; First Data POS, 546 S.E.2d at 784. Additionally, none of the alleged affirmative representations in paragraphs 218(e)–(f) and (j) of the Consolidated Complaint that purportedly give rise to breaches of contract appear to have been made in the License Agreement. Instead, as summarized in the table below, those representations either come from Defendants' websites or Plaintiffs fail to identify the source of them. Since Plaintiffs have failed to allege that any of these representations came from the License Agreement, they cannot, as a matter of law, form the basis of a breach of contract claim. See First Data POS, 546 S.E.2d at 784; [Doc. 1-2 at 26].

| Alleged Breach of Contract | Apparent Alleged Factual Basis |
|---|---|
| **¶ 218(e):** "Falsely representing that the Approved Suppliers in [Defendant Holiday Hospitality's] procurement programs, including but not limited to the 'IHG Marketplace' allow for Franchisee choice, and deliver value and lower cost purchasing opportunities to franchisees when, in fact, franchisees are involuntarily forced to use these Approved Suppliers, charging franchisees above-market rates, rates which are higher than the same Approved Suppliers charge hotel operators not within the … System, and often the Mandatory Products and Services forced upon franchisees are of inferior quality[.]" | • ¶¶ 66–68 (Defendants' websites) <br> • ¶ 77 (no source) |

| Alleged Breach of Contract | Apparent Alleged Factual Basis |
|---|---|
| **¶ 218(f):** Defendant Holiday Hospitality "represents to franchisees that its limited number of Approved Suppliers is for the purpose of obtaining group or volume discounts, or to ensure uniform quality and supply, when it is instead engaged in a scheme to reduce competition within the . . . Franchise System and extract larger kickbacks from these vendors. [Defendant Holiday Hospitality] does not obtain group or volume discounts on behalf of its franchisees[.]" | • ¶ 143 (no source) |
| **¶ 218(g):** Defendant Holiday Hospitality "leverages its Franchise System as a means to secure massive fees from vendors, granting approval to Approved Suppliers who gain access to [Defendant Holiday Hospitality's] franchisees as a quid pro quo for kickbacks in the form of both fixed fees and percentage-based transactional fees, enriching [Defendant Holiday Hospitality] from increased costs borne by franchisees for the Mandatory Products and Services.   [Defendant Holiday Hospitality] never discloses to its franchisees this inherent and abusive conflict of interest from its collusion with manufacturers and/or distributors to increase its own revenue on the backs of its franchisees[.]" | • Omission |
| **¶ 218(j):** "Using the threat and imposition of retaliation and retribution against franchisees who in any way dispute or raise questions about [Defendant Holiday Hospitality's] introduction of programs, fees, or expenses forced on franchisees without any prior disclosure or agreement, or against franchisees who, when presented with [Defendant Holiday Hospitality's] programs falsely represented as optional, opt out of same[.]" | • Omission<br>• ¶ 124 (no source) |

However, Plaintiffs do tie their allegation of a breach of contract in paragraph 218(l) to promises made in the License Agreement. In that paragraph, Plaintiffs allege that Defendants

> breached [their] express and implied duties under the License Agreement by . . . [m]aintaining an IHG Owners Association represented as a means for franchisees to consider and discuss, and make recommendations on common problems relating to the operation of System Hotels which [Defendant Holiday Hospitality] will seek the advice of and to promote the best interests of all persons using the System but, in reality, this representation is false and illusory. Franchisees are afforded no voice, their recommendations are summarily disregarded, and the Owners Association i[s] populated almost entirely by IHG employees to serve the purpose of enriching [Defendants], avoiding accountability, and imposing additional financial hardship on franchisees[.]

Consol. Compl. ¶ 218(l).  Plaintiffs tie this allegation to promises Defendants made in Section 6 of the License Agreement.  See id. ¶¶ 181–90.  That section provides:

> [A given franchisee], other licensees of the System, and [Defendant Holiday Hospitality] are eligible for membership in the IHG Owners Association [(the "IHGOA")] and are entitled to vote at its meetings on the basis of one hotel, one vote, provided that [a given franchisee or Defendant Holiday Hospitality], as the case may be, has paid all its dues and fees owing to the IHG Owners Association.  The purposes of the IHG Owners Association will be to consider and discuss, and make recommendations on common problems relating to the operation of System hotels.  [Defendants] will seek the advice and counsel of the IHG Owners Association's Board of Directors or, subject to the approval of [Defendants], such committees, directors or officers of the IHG Owners Association to which or to whom the IHG Owners Association Board of Directors may delegate such responsibilities.
>
> . . .
>
> . . . .  Recognizing that the IHG Owners Association must function in a manner consistent with the best interests of all persons using the System, [a given franchisee] and [Defendants] will use their best efforts to cause the governing rules of the IHG Owners Association to be consistent with this License.

[Doc. 1-2 at 11–12].

Plaintiffs allege Defendants violated this provision by "handpick[ing]" "IHGOA board members" and by giving them "incentives in exchange for their loyalty to [Defendants'] agenda and interests."   Consol. Compl. ¶ 184.   And "[a]lthough IHGOA's board members are nominally elected by all franchise owners," Plaintiffs claim that "it is essentially impossible for dissenting voices to gain seats on the board" because Defendants "control[] the nominating process through the imposition of onerous and vague requirements for candidacy, which ensure[] that [Defendants] can carefully select candidates and thus [make] the elections to the IHGOA [Board of Directors] . . . noncompetitive." See id. ¶¶ 185–86. Because Defendants covenant in the License Agreement "to seek the advice and counsel" of the IHGOA Board of Directors (the "IHGOA Board") or its designee, Plaintiffs allege that Defendants' aforementioned conduct allowed Defendants to "utterly disregard genuine franchisee complaints, and to instead implement, avoid accountability for, and rubber stamp all matters decided unilaterally by and for these Defendants for the sole purpose of enriching themselves and requiring payments from franchisees." See id. ¶ 190. Plaintiffs allege they suffered monetary damages as result of this conduct. See id. ¶ 220.

Accepting these allegations as true and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs adequately allege a breach of contract based on Defendants' management of the IHGOA. As far as the Court can

discern, the License Agreement does not specify how the IHGOA Board is to be elected.  Thus, binding Georgia law requires Defendants to "exercise . . . good faith" setting up the details of the IGHOA's operations.  See ULQ, 666 S.E.2d at 717; see also Alan's of Atlanta, 903 F.2d at 1429; Martin, 723 S.E.2d at 728.  Additionally, by Section 6 of the License Agreement, Defendants promise to "use their best efforts to cause the governing rules of the [IHGOA] to be consistent with this License," and part of that License includes Defendants' "[r]ecogni[tion] that the [IHGOA] must function in a manner consistent with the best interests of all persons using the System."  [Doc. 1-2 at 12].  Plaintiffs allege that Defendants have (1) engineered IHGOA in such a way so as to privilege themselves at the expense of Plaintiffs and other franchisees and (2) used IHGOA in such a way so as to extract payments from Plaintiffs and other of Defendants' franchisees.  See Consol. Compl. ¶¶ 181–90, 218(l).  Such allegations, if proven, could establish that Defendants have breached their agreement to "use their best efforts to cause the governing rules of the [IHGOA] to be consistent . . . with the best interests of all persons using the System" and their duty to implement the details of IHGOA in good faith in such a way that has caused harm to Plaintiffs.  [Doc. 1-2 at 12].  The breach of contract theory Plaintiffs advance in paragraph 218(l) of the Consolidated Complaint is thus sufficient to survive Defendants' motion to dismiss.

4.   <u>Alleged breaches of contract based on the FDD</u>

In their brief in opposition to Defendants' motion to dismiss, Plaintiffs argue that "[t]he FDD lies at the [h]eart of" their breach of contract claim and that they have "properly pled a plausible breach of contract claim with respect to the breaches of Item 8 of the FDD."   [See Doc. 76 at 7–11, 15–22].   Specifically, Plaintiffs contend that they have adequately pled a breach of contract based on (1) Defendants' "receipt of kickbacks from approved vendors" from whom Plaintiffs were required to buy goods and services "in direct contravention of promises in the FDD" and (2) Defendants' "charging [of] excessive fees which were never disclosed in violation of the FDD and License Agreement."   [See id.]   Defendants counter that the FDD is not part of the contract it had with Plaintiffs and that, even if it was, Plaintiffs allege no breach of it.   [See Doc. 79 at 9–14].

Upon review, the Court agrees with Defendants that the FDD is not an enforceable part of the contract between the Parties.   As noted above, the License Agreement contains an "Entire Agreement" provision.   That provision states

> This is the entire agreement between the [P]arties pertaining to the licensing of the Hotel and supersedes all previous negotiations and agreements between the parties pertaining to the licensing of the Hotel as a Holiday Inn brand group hotel or Holiday Inn Express brand group hotel.   Nothing in the preceding sentence is intended, however, to disclaim any representations [Defendants] made in the franchise disclosure document that [Defendants] provided to [Plaintiffs].   No change in this License will be valid unless in writing signed by both [P]arties.   No failure to require strict performance or to exercise any

> right or remedy hereunder will preclude requiring strict performance or
> exercising any right or remedy in the future.

[Doc. 1-2 at 26].  Because the FDD was provided to Plaintiffs at least fourteen (14)

days *before* they signed the License Agreement and because it concerns Plaintiffs'

licensing of Holiday Inn branded hotels, to the extent it contains any promises

between the Parties at all, the FDD represents a "previous . . . agreement[] between

the Parties" that "pertain[ed] to the licensing of [a] Hotel[.]"  [See id.]  Thus, because

the License Agreement's terms "supersede[]" the FDD, it is not part of the contract

between the Parties.  Therefore, it may not support Plaintiffs' claim for breach of

contract.  [See Docs. 1-2 at 26; 76-1 at 2]; see also First Data POS, 546 S.E.2d at

784.

While the License Agreement's "Entire Agreement" provision also says that

"[n]othing in the" above-referenced "sentence is intended, however, to disclaim any

representations [Defendants] made in the [FDD] that [Defendants] provided to"

Plaintiffs and other franchisees, this does not change the Court's analysis.  [See Doc.

1-2 at 26].  Though this second sentence in the "Entire Agreement" provision is

clearly intended to modify the first, the Court finds that, as a matter of a law, it is

not intended to incorporate the FDD by reference into the License Agreement.  See

Xu v. Yonnone, 875 S.E.2d 368, 369 (Ga. Ct. App. 2022) ("The cardinal rule of

contract interpretation is to construe the contract so as to effectuate the intent of the

parties.").  Instead, the second sentence is intended to clarify that the "Entire

Agreement" provision does not prohibit franchisees like Plaintiffs from pursuing a fraud in the inducement claim based on the FDD. This is clear from the second sentence's use of the word "disclaim" and the first sentence's unequivocal statement that "[t]his is the entire agreement between the parties pertaining to the licensing of the Hotel." [See Doc. 1-2 at 26]. If the Parties had intended to agree that the License Agreement and the FDD *together* made up their contract—rather than just the License Agreement—they would have presumably use language like the following in the "Entire Agreement" provision:

> This License Agreement *and the Franchise Disclosure Document provided to Licensee before entering this License Agreement* represent the entire agreement between the parties pertaining to the licensing of the Hotel . . . .

As set forth above, that is not what the Parties did here. [See Doc. 1-2 at 26].

That the Parties did not intend for the FDD to be part of their contract is further supported by the language of the FDD. The first page of that document notes that the FDD "summarizes certain provisions of your franchise agreement and other information in plain English" and that "[t]he terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully." [Doc. 76-1 at 2]. Had the Parties intended for the FDD to be included in their contract, Defendants would not have included this language in the FDD, which describes the Parties' contract and the FDD as distinct. Indeed, at least two (2) other federal courts have found that a

franchise disclosure document was not part of the contract between a franchisor and franchisee where the disclosure document contained language similar to that found in the FDD here.  See Le Macaron, LLC v. Le Macaron Dev. LLC, No. 8:16-CV-918-17TGW, 2016 WL 6211718, at *3, 6–7 (M.D. Fla. Oct. 24, 2016); Pai v. DRX Urgent Care, LLC, Nos. 13-4333 (JAP)(TJB) & 13-3558(JAP)(LHG), 2014 WL 837158, at *9 (D.N.J. Mar. 4, 2014).

Somewhat puzzlingly, Defendants state in their opening brief that "[t]he FDD . . . is incorporated by reference into the [License] Agreement."  [Doc. 73-1 at 11]. However, the Court finds that this statement is not dispositive of the relationship between the FDD and the License Agreement because (1) this statement was not a judicial admission and (2) the doctrine of judicial estoppel does not foreclose Defendants from recanting it, as they did in their reply brief.  [See Doc. 79 at 12 n.19].  As to the first point, in order for a statement by a party made during litigation to be a binding judicial admission, it must be one "of fact that require[s] evidentiary proof," not a "legal conclusion."  See Starbuck v. R.J. Reynolds Tobacco Co., 349 F. Supp. 3d 1223, 1233 (M.D. Fla. 2018) (quoting In re Teleglobe Commc'ns Corp., 493 F.3d 345, 377 (3d Cir. 2007) and Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC, 477 F.3d 383, 394 (6th Cir. 2007)).  Here, whether the FDD is incorporated by reference into the License Agreement is question of law, not a question of fact, so Defendants' statement is not a judicial admission.  See id.  As to the second point,

the doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000)).  Because Defendants have not yet "prevail[ed] in one phase of [this] case [based] on" their statement that the FDD is incorporated by reference into the License Agreement, judicial estoppel does not prevent them from rescinding that argument now.

For all the foregoing reasons, the Court finds that the License Agreement represents the entire enforceable contract between the Parties and that the FDD is not part of that contract.  Thus, the breach of contract theories Plaintiffs advance in their opposition brief based on Defendants' purported breaches of representations in the FDD fail as matter of law.

### 5.   Alleged breaches of the duty of good faith and fair dealing

Finally, in paragraph 219 of the Consolidated Complaint, Plaintiffs assert that all Defendants "routinely violate the duty of good faith and fair dealing" they owe to Plaintiffs in eight (8) specific ways.  See Consol. Compl. ¶ 219.  Defendants argue that these purported breaches all necessarily fail because (1) Plaintiffs' breach of contract theories fail and (2) each purported breach of the duty of good faith and fair dealing is either authorized by the License Agreement or wholly conclusory.  [See Docs. 73-1 at 24–28; 79 at 18–21].  Plaintiffs contend that Defendants characterize

the duty of good faith and fair dealing too narrowly and that the factual allegations of the Consolidated Complaint support each of the eight (8) alleged breaches of that duty.  [See Doc. 76 at 27–34].

Upon review, the Court agrees with Defendants that all of Plaintiffs' alleged breaches of the duty of good faith and fair dealing fail as a matter of law.  As noted above, "[g]eneral allegations of breach of the implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable."  Am. Casual Dining, 426 F. Supp. 2d at 1370; accord McGee, 746 S.E.2d at 727.  And relatedly, "there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do."  Ameris Bank, 739 S.E.2d at 486; accord Martin, 723 S.E.2d at 728.

Five (5) of Plaintiffs' claims that Defendants breached the duty of good faith and fair dealing relate to the manner in which Defendants directed Plaintiffs to purchase certain products and services.  See Consol. Compl. ¶ 219(a)–(d), (h).  As the Court has already observed, Defendants have unfettered control and discretion pursuant to the License Agreement to require Plaintiffs and other franchisees to use certain goods and services in operating their hotels, and Georgia law imposes no requirement on Defendants to exercise that discretion in good faith.  See supra part III.B.2.c.  Accordingly, the breaches of the duty of good faith and fair dealing Plaintiffs allege in paragraph 219(a)–(d) and (h) of the Consolidated Complaint fail

as a matter of law.  See id.; see also Ameris Bank, 739 S.E.2d at 486; Martin, 723 S.E.2d at 728.

Plaintiffs contend that the three (3) other purported breaches of the duty of good faith and fair dealing—those described in paragraphs 219(e)–(g) of the Consolidated Complaint—are supported by their allegations that Defendants received improper rebates and kickbacks from suppliers and charged Plaintiffs excessive fees and costs through the PIP program in violation of the License Agreement and FDD.  [See Doc. 76 at 30 (citing Consol. Compl. ¶¶ 61–108 and [Doc. 76-1 at 54])].  However, as the Court has already observed, Defendants' actions related to the goods and services they required Plaintiffs to buy and the PIP program were authorized by the License Agreement, and the FDD is not part of Plaintiffs' contract with Defendants.  See supra parts III.B.2.b–c.  Because "there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do[,]" the breaches of the duty of good faith and fair dealing Plaintiffs allege in paragraph 219(e)–(g) of the Consolidated Complaint fail as a matter of law.  See id.; see also Ameris Bank, 739 S.E.2d at 486; Martin, 723 S.E.2d at 728.

6.   Summary

In short, eleven (11) of the twelve (12) purported breaches of contract and all eight (8) purported breaches of the duty of good faith and fair dealing Plaintiffs

allege in the Consolidated Complaint fail as a matter of law.  Additionally, the FDD is not part of the Parties' contract and cannot support any breach of contract claim from Plaintiffs.  Accordingly, the Court dismisses Count I of the Consolidated Complaint to the extent it relies on any theory other than that alleged in paragraph 218(l) of the Consolidated Complaint.

### C.  Count II: Violations of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et seq.*

In Count II, Plaintiffs allege that Defendants violated the Georgia Uniform Deceptive Trade Practices Act (the "GUDTPA") in six (6) specific ways.  See Consol. Compl. ¶¶ 221–30.  Citing two (2) Eleventh Circuit opinions and one decision of this district, Defendants argue that, as a matter of law, no GUDTPA claim can proceed between two (2) commercial parties because the GUDTPA is essentially Georgia's version of the Lanham Act, and Lanham Act claims must involve some consumer confusion.  [See Docs. 73-1 at 28–29 (citing Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1248 n.11 (11th Cir. 2007); Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1203 (11th Cir. 1997); and Hammond v. Home Depot, USA, Civil Action No. 1:05-CV-02219-ODE, 2006 WL 8432819, at *6 (N.D. Ga. May 16, 2006)); 79 at 23–24].  Plaintiffs contend that Defendants construe the GUDTPA's scope too narrowly and argue that their GUDTPA claim is supported by "detailed and specific allegations."  [See Doc. 76 at 34–36].

Upon review, the Court agrees with Plaintiffs and finds that the GUDTPA's scope is broad enough to reach transactions which, like those at issue here, involve only commercial parties.   As the Bankruptcy Court for the Middle District of Georgia observed in a decision thoroughly analyzing the statute: "the plain language of [the GUDTPA] requires only that the plaintiff is a person who has suffered an injury due to the deceptive trade practice of the defendant."   In re Johnston Indus., Inc., 300 B.R. 821, 822 (Bankr. M.D. Ga. 2003).   And "[f]or purposes of . . . [the G]UDTPA, a person is defined as 'an individual, corporation, government, or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, two or more of any of the foregoing having a joint or common interest, or any other legal or commercial entity.'"   Id. (quoting O.C.G.A. § 10-1-371(5)).   Thus, "[n]othing in the language of the statute requires the plaintiff to be a consumer or requires a consumer to be injured."   Id. at 822–23.

Kason Industries v. Component Hardware Group., Inc.—one of the two (2) Eleventh Circuit opinions Defendants cite—is consistent with this analysis.   There, the Eleventh Circuit considered what statute of limitations should apply to GUDTPA claims.   See Kason Indus., 120 F.3d at 1203.   In so doing, the court commented that the Georgia Fair Business Practices Act "is significantly different from the [G]UDTPA and the Lanham Act, because of the [Georgia Fair Business Practices Act]'s focus on the consumer (as opposed to the commercial) marketplace."   See id.

at 1204.  And it analogized the Lanham Act only to one of the of the twelve (12) types of trade practices GUDTPA outlaws, those prohibited by O.C.G.A. § 10-1-372(a)(2).  See id. at 1204.  Similarly, Optimum Technologies. v. Henkel Consumer Adhesives, Inc.—the other Eleventh Circuit opinion Defendants cite—does not support Defendants' proposed construction of the GUDTPA.  In the footnote from that case that Defendants cite, the Eleventh Circuit did not make a sweeping statement about the scope of the GUDTPA; rather, the panel merely explained that when a plaintiff brings both a Lanham Act claim and a GUDTPA claim that sounds in trademark infringement, the legal analysis for both claims is the same.  See Optimum Techs., 496 F.3d at 1247–48, 1248 n.11.  Finally, to the extent Hammond v. Home Depot, USA—the district court decision Defendants cite in support of their GUDTPA argument—stands for the proposition that GUDTPA claims cannot brought be in cases like the one at the bar, the Court finds it non-binding and unpersuasive and accordingly declines to follow it.  See 2006 WL 8432819, at *6; see also Georgia v. President of the United States, 46 F.4th 1283, 1304 (11th Cir. 2022) ("[A] district court's decisions do not bind other district courts, other judges on the same court, or even the same judge in another case.").

Having decided that the GUDTPA's scope is broad enough to include one commercial party's claims against another, the Court also finds that Plaintiffs adequately allege their GUDTPA claim.  At a minimum, Plaintiffs allege that

Defendants violated the GUDTPA's prohibition on "[e]ngag[ing] in any . . . conduct which . . . creates a likelihood of confusion or of misunderstanding" regarding their IHG Marketplace program.   See O.C.G.A. § 10-1-372(a)(12).   Specifically, Plaintiffs allege that Defendants represent that this program is a "not-for-profit platform" that gives Defendants' franchisees access to "optimum pricing . . . resulting in significant savings and value" and that is "designed to cut costs and . . . to achieve unparalleled cost savings."   See Consol. Compl. ¶¶ 68–69.   Plaintiffs further allege that Defendants represent the IHG Marketplace program benefits franchisees by passing along "[r]ebates and discounts" generated from the program "directly to" franchisees.   See id. ¶ 69.   Nonetheless, Plaintiffs claim that the prices of products they must purchase through IHG Marketplace "are invariably above-market"; that "these inflated prices allow for rebates that go to [Defendants] directly by suppliers which generally range from approximately 1–5% of the amount of the invoice price for the goods and services purchased by franchisees," and that "[t]hese kickbacks to [Defendants] are the primary—if not the sole—reason [that Defendants'] franchisees are forced to use expensive vendors and suppliers not of their own choosing at supra-competitive pricing."   See id. ¶¶ 73–75.   Taken together, the Court finds that these allegations, if proven, could state a plausible GUDTPA

claim.[14]   See O.C.G.A. § 10-1-372(a)(12).   Accordingly, the Court denies

Defendants' motion to dismiss the Consolidated Complaint with respect to Count II.

### D.    Count III: Declaratory Judgment

By Count III, "[p]ursuant to the Uniform Declaratory Judgment Act, 28

U.S.C. § 2201, Plaintiffs seek declaratory judgment from this Court that" certain

provisions of the License Agreement "are unconscionable, illusory and/or

unenforceable." See Consol. Compl. ¶ 240; see also id. ¶¶ 231–39. Defendants first

argue that Plaintiffs lack standing to pursue their declaratory judgment claim

because they "fail[] to allege any actual dispute beyond [Plaintiffs'] general

dissatisfaction with the [License] Agreement[]." [Doc. 73-1 at 29–32]. Defendants

separately assert that Plaintiffs fail to adequately allege a claim for unconscionability

because nothing in the Amended Complaint suggests that the License Agreement is

procedurally or substantively unconscionable. [See id. at 32–41]. Plaintiffs respond

by arguing that their claim that certain provisions of the License Agreement are

unconscionable creates "actual controversies that give rise to potential future

injury," and they contend that the Consolidated "Complaint identifies several

provisions of the License Agreement that together and/or individually are

substantively unconscionable." [See Doc. 76 37–40]. Plaintiffs do not respond to

---

[14] Defendants have not challenged any of the specific GUDTPA theories Plaintiffs articulate in the Consolidated Complaint. [See Docs. 73-1 at 28–29; 79 at 23–24]. The Court therefore declines to evaluate the sufficiency of those theories at this stage. At present, it is sufficient that Plaintiffs have articulated at least one colorable GUDTPA theory.

Defendants' argument that they fail to allege that the License Agreement is procedurally unconscionable.   [See id.]   Below, the Court considers whether Plaintiffs have standing to pursue their declaratory judgment claim before evaluating whether they adequately allege unconscionability.

        1.    <u>Standing</u>

> To establish Article III standing, the plaintiff must "show, among other things, that he has suffered an injury in fact-some harm to a legal interest that is *actual or imminent,* not conjectural or hypothetical." <u>Bowen v. First Family Fin. Servs., Inc.</u>, 233 F.3d 1331, 1339 (11th Cir. 2000) (emphasis in original) (quotations omitted).   "A plaintiff has standing to seek declaratory or injunctive relief only when he alleges facts from which it appears there is a substantial likelihood that he will suffer injury in the future." <u>Id</u>. at 1340.   "The remote possibility that a future injury may happen is not sufficient to satisfy the actual controversy requirement for declaratory judgments." <u>Malowney v. Fed. Collection Deposit Grp.</u>, 193 F.3d 1342, 1347 (11th Cir. 1999) (quotation omitted).

<u>Owners Ins. Co. v. Parsons</u>, 610 F. App'x 895, 896–97 (11th Cir. 2015).   In keeping with these principles,

> [d]istrict courts may consider declaratory judgment suits only where a "definite and concrete" controversy exists.   <u>Miccosukee Tribe of Indians of Fla. v. Kraus-Anderson Constr. Co.</u>, 607 F.3d 1268, 1275 n.14 (11th Cir. 2010).   The "controversy" must be "real and substantial . . . admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, [241] (1937).

<u>Id.</u> at 897 (ellipsis in original).

Here, the Court finds that Plaintiffs sufficiently allege that they have standing to pursue their declaratory judgment claim.  Plaintiffs do not ask the court for "an opinion advising what the law would be upon a hypothetical state of facts."  See id. Instead, Plaintiffs ask the Court to determine whether certain provisions of the License Agreement are enforceable in light of the facts of the relationship between Defendants on the one hand and Plaintiffs (and other franchisees of Defendants) on the other.  See Consol. Compl. ¶¶ 231–40.  Specifically, Plaintiffs allege that they are injured in fact by being forced to adhere to the purportedly unconscionable provisions in their contracts; that this injury is traceable to the conduct of Defendants, who used their "vastly superior bargaining power to require all franchisees to accept" the purportedly unconscionable terms; and that the Court can redress Plaintiffs' injuries by declaring the purportedly unconscionable provisions unenforceable.  See generally id.

### 2.    Whether Plaintiffs adequately allege unconscionability

"For a contract to be found unconscionable under Georgia law, there generally must be both procedural and substantive unconscionability."  Clark v. Aaron's, Inc., 914 F. Supp. 2d 1301, 1310 (N.D. Ga. 2012); accord Innovative Images, LLC v. Summerville, 848 S.E.2d 75, 83 (Ga. 2020) ("We examine unconscionability from the perspective of *substantive* unconscionability, which "looks to the contractual terms themselves," and *procedural* unconscionability, which considers the "process

of making the contract." (emphasis in original)); NEC Techs., Inc. v. Nelson, 478

S.E.2d 769, 773 n.6 (Ga. 1996) ("[T]o tip the scales in favor of unconscionability,

most courts seem to require a certain quantum of procedural plus a certain quantum

of substantive unconscionability.").

> To determine whether a contract is procedurally unconscionable, Georgia's courts consider various factors including, among others, [the] "age, education, intelligence, business acumen and experience of [the] parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice." Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1377 (11th Cir. 2005) (quoting NEC Techs., 478 S.E.2d at 772).  To assess a claim of substantive unconscionability, Georgia's courts "have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." NEC Techs., 478 S.E.2d at 772.

Jones v. Waffle House, Inc., 866 F.3d 1257, 1265 (11th Cir. 2017).

In the matter at bar, Plaintiffs allege that "[t]he License Agreement[] [is]

procedurally unconscionable because," (1) at [the] inception of the Agreement[],

[Defendant Holiday Hospitality] used its vastly superior bargaining position to

require franchisees to accept the" terms Plaintiffs now contend are "grossly

unequal"; (2) "the License Agreement[] [is a] contract[] of adhesion offered on a

'take it or leave it' basis"; (3) the terms Plaintiffs challenge "are not subject to

negotiation"; and (4) Defendant Holiday Hospitality "draft[ed] the [License]

Agreement[] in [its] entirety."  See Consol. Compl. ¶¶ 235–38.  These facts, if

proven, are insufficient as a matter of law to support a finding that the License Agreement is procedurally unconscionable.  See Jones, 866 F.3d at 1265–66 (affirming a finding of no procedural unconscionability where the contract at issue was one of adhesion, the plaintiff's "business acumen and experience fell below that of" the defendant, and 'the bargaining positions of the two parties might have been unequal"); In re Checking Account Overdraft Litig., 672 F.3d 1224, 1229 (11th Cir. 2012) ("[U]nder Georgia law, an adhesion contract is not per se unconscionable."); Cobra Tactical, Inc. v. Payment All. Int'l Inc., 315 F. Supp. 3d 1342, 1351 (N.D. Ga. 2018) (finding no procedural unconscionability in an agreement between defendant "large payment processing servicers" and plaintiff "'mom and pop'-type merchants" where the plaintiffs needed the defendants' services to "to make themselves competitive in the marketplace," were "at the mercy of . . . [d]efendants" as a result, and defendants took "full advantage of th[ese] fact[s] by imposing . . . decidedly one-sided [t]erms on [the p]laintiffs without negotiation or the ability to 'opt out' of disfavored provisions").

Indeed, here, Plaintiffs were given a "disclosure document[, the FDD, that] summarizes certain provisions of" the License Agreement "in plain English"; were told to "[r]ead th[at] disclosure document and all accompanying agreements carefully"; were unable to sign the License Agreement until they had the FDD for at least fourteen (14) days; and were admonished to "[s]how" the License Agreement

and FDD "to an advisor, like a lawyer or an accountant." [See Doc. 76-1 at 2]. This pre-contractual process weighs strongly against a finding of procedural unconscionability here.

In short, the Court finds that the Consolidated Complaint fails to allege facts which, if proven, would show that the License Agreement is procedurally unconscionable. Plaintiffs' declaratory judgment claim is solely based on a theory of unconscionability. See Consol. Compl. ¶¶ 231–40. Thus, that claim fails as a matter of law regardless of whether the terms Plaintiffs challenge are substantively unconscionable. See Clark, 914 F. Supp. 2d 1301, 1310 (N.D. Ga. 2012); Innovative Images, 848 S.E.2d at 83; NEC Techs., 478 S.E.2d at 773 n.6. Accordingly, the Court dismisses Plaintiffs' Count III.

### E.     Count IV: Violations of the Sherman Act, 15 U.S.C. § 1

In Count IV, Plaintiffs allege that that "[t]here exist markets for ownership interests in hospitality franchises, in which [Defendant Holiday Hospitality] maintains substantial market power" and that "[a] separate market exists for the related goods and services associated with the operations of hospitality franchises," which they term "Mandatory Products and Services." See Consol. Compl. ¶¶ 242–43. Plaintiffs claim that, "[a]t all times relevant[, Defendant Holiday Hospitality] had monopoly power, market power, and/or economic power in the relevant . . . market" for hospitality franchises "sufficient to force franchisees to purchase and

accept Mandatory Products and Services." See id. ¶¶ 251–54.  Plaintiffs contend that "[a]s a direct and proximate result of [this] anti-competitive tying activity, [they] have been injured by being forced to pay above-market rates for inferior Mandatory Products and Services." See id. ¶ 255.  Accordingly, Plaintiffs allege that Defendant Holiday Hospitality's requirement that Plaintiffs buy Mandatory Products and Services "is *per se* unlawful in violation of Section One of the Sherman Act" or "[a]lternatively, . . . unlawful under the rule of reason, in that the anti-competitive consequences of [Defendant Holiday Hospitality's] conduct outweigh any pro-competitive effects thereof." See id. ¶¶ 257–58.

Defendants argue that Plaintiffs' antitrust claim is due to be dismissed because the Consolidated Complaint (1) fails to properly define a relevant market on which their antitrust claim is based, (2) fails to allege that Defendants had market power in that relevant market in a non-conclusory way, (3) does not support the inference that Defendants' conduct "caused any anticompetitive effects in the" market for the Mandatory Products and Services Plaintiffs claim they were coerced into buying and (4) relies at least in part on time-barred conduct.  [See Docs. 73-1 at 41–55; 79 at 26–35].  In response, Plaintiffs argue that (1) only notice pleading is required in antitrust cases; (2) they adequately allege a relevant market; (3) they sufficiently allege a "lock-in claim" like that the Supreme Court discussed in Eastman Kodak

Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992); and (4) all their antitrust claims

are timely.  [See Doc. 76 at 40–52].

> Section 1 of the Sherman Act makes unlawful "[e]very contract,
> combination in the form of trust or otherwise, or conspiracy, in restraint
> of trade or commerce among the several States." 15 U.S.C. § 1.
> Although the section's language seems automatically to prohibit any
> kind of concerted restraint of trade, the Supreme Court's interpretation
> of the Act indicates that many forms of concerted action are to be
> evaluated under a flexible, case-by-case standard: the so-called "rule of
> reason." See Standard Oil Co. v. United States, 221 U.S. 1, 58–62[]
> (1911) (adopting the rule of reason).  Under the rule of reason, "the
> factfinder weighs all of the circumstances of a case in deciding whether
> a restrictive practice should be prohibited as imposing an unreasonable
> restraint on competition." Cont'l T.V., Inc. v. GTE Sylvania Inc., 433
> U.S. 36, 49[] (1977).
>
> By contrast, per se violations of § 1 of the Sherman Act are limited to
> a very small class of antitrust practices whose character is well
> understood and that almost always harm competition.

Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1333–34 (11th Cir. 2010).  A

tying arrangement—"an agreement by a party to sell one product but only on the

condition that the buyer also purchases a different (or tied) product, or at least agrees

that he will not purchase that product from any other supplier," Kodak, 504 U.S. at

461—is among the "classic . . . forms of anti-competitive behavior[]" that can be a

per se violation of the Sherman Act.  See Thompson v. Metro. Multi-List, Inc., 934

F.2d 1566, 1574 (11th Cir. 1991).  However, the Eleventh Circuit has "recognized

that tying claims can also be analyzed under the rule of reason[,]" depending on the

circumstances of a particular case.  See id.

Regardless of whether a § 1 plaintiff brings a *per se* or rule of reason-based claim, he "must define both (1) a geographic market and (2) a product market." Jacobs, 626 F.3d at 1336.  And "[a]lthough the 'parameters of a given market are questions of fact,' antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets."  Id. (quoting Thompson, 934 F.2d at 1573).  "The relevant geographic market is 'the area of effective competition in which a product or its reasonably interchangeable substitutes are traded.'"  Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 797 F.3d 1248, 1263 (11th Cir. 2015) (quoting L.A. Draper & Son v. Wheelabrator–Frye, Inc., 735 F.2d 414, 423 (11th Cir. 1984)).  In defining the relevant geographic market, a "[c]ourt considers whether outside sellers are precluded from entering the market, and whether consumers cannot realistically turn outside the geographic area[.]"  Id. (citation omitted).  Relevant considerations in the geographic market analysis include "[e]conomic and physical barriers to expansion such as transportation costs, delivery limitations[,] and customer convenience and preference[.]"  Id. (alteration adopted) (quoting L.A. Draper & Son, 735 F.2d at 423).

A relevant product "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."  United States v. E. I. du Pont de Nemours & Co. (The

Cellophane Case), 351 U.S. 377, 404 (1956).  Thus, "[d]efining the relevant product market involves identifying 'producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services.'"  Jacobs, 626 F.3d at 1337 (quoting Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1552 (11th Cir. 1996)).  When analyzing the relevant product market, "[a] court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because 'if consumers view the products as substitutes, the products are part of the same market.'"[15]  Id. at 1337–38 (quoting Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995)).  In other words, "the uses to which the [challenged] product is put by consumers in general" is the "[m]ost important[]" consideration in the relevant product market inquiry.  Id. at 1337 (quoting Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1221 (11th Cir. 2002) and Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3d Cir. 1997)).

---

[15] "The cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another.  A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one. For purposes of the relevant product market analysis, a high cross-elasticity of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market." Jacobs, 626 F.3d at 1338 n.13 (citing The Cellophane Case, 351 U.S. at 400).

Here, Plaintiffs fail to adequately allege either a relevant geographic market or a relevant product market. The Court begins with the relevant product market. See id. at 1336 ("[S]ince both the geographic and product market allegations are necessary for a plaintiff suing under § 1 of the Sherman Act to succeed, a court, in assessing the sufficiency of the complaint, may begin by analyzing either one."). As noted, Plaintiffs allege that "[t]here exist markets for ownership interests in hospitality franchises, in which [Defendant Holiday Hospitality] maintains substantial market power." Consol. Compl. ¶ 242. Beyond this conclusory assertion, Plaintiffs do nothing to define the relevant product market. They assert in opposition to Defendants' motion to dismiss that they "have . . . alleged well-defined antitrust markets for the tying and tied products."[16] [See Doc. 76 at 41]. But the paragraphs of the Consolidated Complaint Plaintiffs cite to in support of this assertion—paragraphs 61–87 and 241–258—do nothing to define the market for "hospitality franchises" that they allege exists; instead, they simply describe various details about the Mandatory Products and Services Plaintiffs claim they were forced to accept with their licenses to operate hotels under Defendants' brands and the purported harm Plaintiffs suffered as a result. See Consol. Compl. ¶¶ 61–87, 241–258. These paragraphs offer no explanation of what types of franchises are included

---

[16] Because the Parties focus on Plaintiffs' market definition for the tying product, i.e., the franchises Plaintiffs purchased, the Court does not consider whether Plaintiffs adequately allege a relevant market for the tied product, i.e., for the Mandatory Products and Services. [See Docs. 73-1 at 41–55; 76 at 40–52; 79 at 26–35].

in the market for "hospitality franchises." See id. This is particularly problematic here because the word is "hospitality" is a broad descriptor. See Hospitality, Webster's Third New International Dictionary (2002) (defining "hospitality" as "the cordial and generous exception and entertainment of guests or strangers socially or commercially"); Hospitality, Oxford English Dictionary (2d. ed. 1989) (defining the same as "[t]he act or practice of being hospitable; the reception and entertainment of guests, visitors, or strangers, with liberality and goodwill"). Thus, Plaintiffs' proposed relevant market could include everything from fast food franchises to those for sports bars to the type of hotel franchises which Plaintiffs themselves operate. Therefore, the Consolidated Complaint leaves the Court without any information about what facts, if proven, it could use to "identify[] 'producers that [could] provide'" Plaintiffs "with alternative sources for" products like the licenses they purchased from Defendants. See Jacobs, 626 F.3d at 1337.

Plaintiffs appear to contend that they need not do anything more than say that "[t]here exist markets for ownership interests in hospitality franchises" to advance their Sherman Act claim past the pleadings stage. [See Doc. 76 at 40–46]; see also Consol. Compl. ¶ 242. But this argument is squarely contradicted by binding Eleventh Circuit caselaw. In Jacobs v. Tempur-Pedic International, Inc., the Eleventh Circuit was confronted with a complaint that "allege[d], without elaboration, that 'visco-elastic foam mattresses comprise a relevant product market,

or sub-market, separate and distinct from the market for mattresses generally, under the federal antitrust laws.'"  See 626 F.3d at 1338 (quoting the relevant complaint). The district court dismissed the complaint for failure to allege a relevant product market.  Id. at 1332, 1337.  On appeal, the plaintiff argued that his above-referenced allegation was sufficient to allow his Sherman Act claim to survive a motion to dismiss because the relevant product market analysis is a fact-intensive one and "he did not have the chance to add facts in discovery which would have established visco-elastic foam mattresses as a separate relevant product []market."  Id. at 1337. The Eleventh Circuit determined that it could not

> accept this argument [from the plaintiff] because it would absolve [him] of the responsibility under Twombly to plead facts "plausibly suggesting" the relevant []market's composition.  [The plaintiff's] skimpy allegations of the relevant []market do not meet this obligation. . . . Th[e plaintiff's] conclusory statement [regarding the relevant product market] merely begs the question of what, exactly, makes foam mattresses comprise this []market.  The complaint provides no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general.

Id. at 1338.

So too, here, Plaintiffs' bare bones allegation regarding the "market[] for ownership interests in hospitality franchises" "begs the question of what, exactly, makes" the market for hospitality franchises distinct from the market from any other type of franchise or investment opportunity.  See id.; see also Consol. Compl. ¶¶ 10, 242.  This is particularly true given that the Consolidated Complaint "provides no

factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether" those seeking to operate a hotel or other "hospitality franchise[]" treat such franchises "differently than they do" other types of franchises or investment opportunities "in general." See Jacobs at 1338. For these reasons, Plaintiffs' allegations of a relevant product market are insufficient such that their Sherman Act claim is due to be dismissed.

Even if their product market allegations were insufficient, dismissal of Plaintiffs' Sherman Act claim would still be warranted because Plaintiffs do not appear to allege a relevant geographic market at all. See generally Consol. Compl.; see also Jacobs, 626 F.3d at 1336 (noting that "both . . . geographic and product market allegations are necessary for a plaintiff suing under § 1 of the Sherman Act to succeed"). Plaintiffs acknowledge that Defendants' argument that they "have failed to identify or define a relevant tying market in terms of . . . geography," but they do not respond to that argument by directly stating what their alleged relevant geographic market is. [See Doc. 76 at 41]. Instead, as noted above, Plaintiffs point to paragraphs 61–87 and 241–58 of the Consolidated Complaint and assert that these paragraphs "allege[] well-defined antitrust markets for the tying and tied products." [See id.] But, because these allegations do not reference any particular geographic location at all, they are wholly insufficient to put the Court and Defendants on notice of the "area of effective competition in which" the "hospitality franchises" that

Plaintiffs allege compose the relevant market are "traded."  <u>See</u> Consol. Compl. ¶¶ 61–87, 241–258; <u>Duty Free Americas</u>, 797 F.3d at 1263.

Because Plaintiffs fail to adequately allege either a relevant product or geographic market sufficient to support their Sherman Act, that claim fails as a matter of law.  The Court therefore dismisses Plaintiffs' Count IV.[17]

### F.     Count V: Accounting

In Count V, Plaintiffs allege that Defendant Holiday Hospitality "owed franchisees express contractual duties not to charge fees which were not contractually proscribed but nevertheless charges direct and indirect fees to Plaintiffs which were not authorized by the License Agreement[]."  Consol. Compl. ¶ 259. Plaintiffs claim that they "are unable to determine the amounts due to them without an accounting and there is no adequate remedy at law without such an accounting, or such legal remedies would be difficult, inadequate, or incomplete."  <u>Id.</u> ¶ 263. Accordingly Plaintiffs assert that Defendant Holiday Hospitality "owes [them] a duty to account for monies[.]"  <u>Id.</u> ¶ 261.  Defendants argue that this claim is "derivative" of Plaintiffs' breach of contract claim and "should be dismissed because" Plaintiffs "allege no facts to show that [Defendants] breached any

---

[17] Because Plaintiffs' failure to allege the relevant product and geographic markets fully disposes of Plaintiffs' Sherman Act claim, the Court declines to consider whether Plaintiffs adequately allege market power or a <u>Kodak</u>-style "lock-in" claim or whether Plaintiffs' Sherman Act claim is time-barred.

obligation in the [License] Agreement[] and[] thus[] cannot establish any entitlement to recoup any amounts from" Defendants.  [See Docs. 73-1 at 41; 79 at 35].

As noted above, Plaintiffs adequately allege one breach of contract theory in paragraph 218(l) of the Consolidated Complaint.  See supra part III.B.3.  However it is unclear what specific fees Plaintiffs allege are connected to this breach of contract theory.  See Consol. Compl. ¶ 218(l).  Thus, the Court declines to dismiss Plaintiffs' Count V at this time.  Importantly, this ruling does not mean that Plaintiffs are necessary entitled to an equitable accounting.  "In Georgia, an equitable accounting is 'not a proceeding to which every litigant has as a right' and should be 'granted only in carefully prescribed and determined circumstances.'"  See Ralls Corp. v. Huerfano River Wind, LLC, 27 F. Supp. 3d 1303, 1330 (N.D. Ga. 2014) (quoting Herring v. Std. Guar. Ins. Co., 232 S.E.2d 544, 545 (Ga. 1977)).  And "[a]n accounting is generally unnecessary in a breach of contract action where a party may utilize the discovery process and, where necessary, orders of the court to enforce compliance with discovery obligations to determine the full amounts owed under the contract."  nVision Glob. Tech. Sols., Inc. v. Cardinal Health 5, LLC, 887 F. Supp. 2d 1240, 1276 (N.D. Ga. 2012).  Thus, Plaintiffs should be able to "utilize the discovery process" to obtain the information they need to prosecute their breach of contract claim, particularly given that this order narrows the permissible scope of that claim considerably.  See id.

Nonetheless, the Court recognizes that it cannot determine at present whether discovery will provide Plaintiffs with all the information they need to calculate their alleged breach of contract damages (if they are ultimately successful on their breach of contract claim) and that an equitable accounting is permissible in "[c]ases where accounts are complicated and intricate."   See O.C.G.A. § 23-2-70.   Therefore, Plaintiffs may request an equitable accounting at a later procedural juncture, should such an accounting become necessary.   For these reasons, the Court denies Defendants' motion to dismiss with respect to Count V.

### G.   Count VI: Attorneys' Fees and Litigation Expenses Pursuant to O.C.G.A. § 13-6-11

In Count VI, Plaintiffs allege that "Defendants[,] through their actions . . . described [in the Consolidated Complaint,] acted in bad faith, were stubbornly litigious, or caused the Plaintiffs . . . unnecessary trouble and expense with respect to the transaction or events underlying this litigation."   See Consol. Compl. ¶ 266. Plaintiffs contend they are entitled to attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11 as a result.   See id. ¶¶ 265, 267.   Defendants contend that Plaintiffs' O.C.G.A. § 13-6-11 claim should be dismissed because of each of Plaintiffs' substantive claims fails and because Plaintiffs "allege[] no facts to support recovery of attorneys' fees under the standard of O.C.G.A. § 13-6-11."   [See Docs. 73-1 at 55; 79 at 35].   As noted above, Plaintiffs' claims for breach of contract and violations of the GUDTPA survive Defendants' motion to dismiss.   See supra parts

III.B.3, III.C.  And Defendants offer no explanation or authority in support of their second argument to dismiss Plaintiffs' O.C.G.A. § 13-6-11 claim.  [See Docs. 73-1 at 55; 79 at 35].  Accordingly, the Court denies Defendants' motion to dismiss with respect to Count VI.

## H.    Count VII: Punitive Damages Pursuant to O.C.G.A. § 51-12-5.1

By Count VII, Plaintiffs seek "an award of punitive damages against Defendants" pursuant to O.C.G.A. § 51-12-5.1 "to penalize and deter" them.  See Consol. Compl. ¶¶ 268–70.  Defendants argue that this claim is due to be dismissed because of each of Plaintiffs' substantive claims fails and because Plaintiffs "have asserted no tort claim that could support punitive damages."  [See Docs. 73-1 at 55; 79 at 35].  As noted above, Plaintiffs' claims for breach of contract and violations of the GUDTPA survive Defendants' motion to dismiss.  See supra parts III.B.3, III.C.  However, neither of these claims can support an award of punitive damages.  See Walia v. Walia, 847 S.E.2d 8, 12 (Ga. Ct. App. 2020) ("Punitive damages are not recoverable in actions for breach of contract, even if the breaching party did so in bad faith."); Moore-Davis Motors, Inc. v. Joyner, 556 S.E.2d 137, 140 (Ga. Ct. App. 2001) ("[T]he sole remedy available under the [G]UDTPA is injunctive relief[.]"); see also O.C.G.A. § 51-12-5.1(b) ("Punitive damages may be awarded *only in such tort actions* in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness,

oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." (emphasis added)).   Accordingly, the Court dismisses Plaintiffs' Count VII.

## I.     Request for Leave to Amend

The Court closes by addressing the request Plaintiffs make in their opposition brief that, "to the extent this Court is inclined to dismiss any of the claims asserted in the Consolidated Complaint, Plaintiffs respectfully request that they be provided leave to re-plead."   [See Doc. 76 at 53].   The Court denies Plaintiffs' request for leave to amend the Consolidated Complaint because: (1) most, if not all, of the pleading deficiencies identified above could not be cured through more careful pleading, (2) motions to dismiss filed by Defendants in this and other cases before Plaintiffs filed their Consolidated Complaint put Plaintiffs on notice that their claims might be deficient for the reasons described herein [see, e.g., Doc. 25-1], and (3) Plaintiffs have not filed a proper motion for leave to amend and instead only make this request in their opposition brief.   See, e.g., Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc., 673 F. App'x 925, 929–30 (11th Cir. 2016) (finding, in circumstances similar to these, that a district court did not "abuse[] its discretion in declining to offer [the p]laintiff an opportunity to amend its pleading a second time"); Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (finding that a district court did not abuse its discretion in declining to grant a plaintiff further

leave to amend and noting that a "district court . . . need not 'allow an amendment . . . where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed . . . or . . . where amendment would be futile'" (quoting <u>Bryant v. Dupree</u>, 252 F.3d 1161, 1163 (11th Cir. 2001)).[18]

## IV.   Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' "Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint." [Doc. 73].  The Court **DENIES** the motion with respect to (1) Count I to the extent that Count is based on the breach of contract theory advanced in paragraph 218(l) of the Consolidated Complaint, (2) Count II, (3) Count V, and (4) Count VI.  The Court **GRANTS** the motion with respect to (1) Count I to the extent that Count is based on breach of contract theories other than those advanced in paragraph 218(l) of the Consolidated Complaint, (2) Count III, (3) Count IV, and (4) Count VII.

---

[18] Further, the Court notes that all three (3) of the cases other than <u>Corsello</u> that Plaintiffs cite in support of their request for leave to amend involved *pro se* plaintiffs.  [<u>See</u> Doc. 76 at 53]; <u>Heard v. Fla. Dep't of Corr. Sec'y</u>, No. 21-13256, 2022 WL 1740690, at *2 (11th Cir. May 31, 2022); <u>Hunt v. Nationstar Mortg.</u>, No. 21-10398, 2022 WL 1701487, at *1 (11th Cir. May 27, 2022); <u>Woldeab v. Dekalb Cnty. Bd. of Educ.</u>, 885 F.3d 1289, 1290 (11th Cir. 2018).  Those cases are inapposite here where "Plaintiffs have retained competent counsel and intend to prosecute this action vigorously."  <u>See</u> Consol. Compl. ¶ 210.

The Court **DIRECTS** that, within thirty (30) days of the date of this order, (1) Defendants answer the Consolidated Complaint; (2) the Parties serve the initial disclosures required by Federal Rule of Civil Procedure 26(a)(1) and Local Rule 26.1; and (3) the Parties confer and file a Joint Preliminary Report and Discovery Plan in accordance with Local Rule 16.2. [See Doc. 64 at 3].

**SO ORDERED**, this 16th day of February, 2022.

Eleanor L. Ross
United States District Judge
Northern District of Georgia